## WESTERN UNION TELEGRAPH COMPANY v. G. W. BRYSON.

### Decided January 19, 1901.

**1.—Telegraphs—Death Message—Delay in Delivery—Excuse for Recipient's Failure to Act Promptly.**

Plaintiff sued for damages for delay in delivering a message announcing the serious illness of his brother, whereby he was prevented from being at the funeral. Had he taken the first train after receiving the delayed message, he would still have arrived in time for the funeral, but he failed to take such first train because of his son's sickness, the condition of his business, and other circumstances. See the opinion for facts held to warrant the court in refusing to direct a verdict for the defendant, and in submitting to the jury the issue as to whether there was a sufficient excuse for plaintiff's failure to act promptly in starting.

**2.—Same—Charge.**

In submitting the issue as to whether there was a sufficient excuse shown for plaintiff's failure to take the first train, the court charged the jury: "If you believe from the evidence that a reasonably diligent and prudent man, possessed of the same information that plaintiff had, and similarly situated and circumstanced as plaintiff was, as shown from all of the evidence before you, would have started to his brother on the train that passed C. at 2:30 o'clock of that

day, then the plaintiff will be precluded from a recovery." Held, that the charge was all that was required.

**3.—Same—Same.**

The court properly refused to charge that defendant was not liable if, by a reasonable expenditure of money, plaintiff could have lessened or prevented the injury, since plaintiff's excuse for delay involved more than an expenditure of money.

**4.—Same—Office Hours.**

Evidence that the telegraph office was kept open until 12 o'clock at night, and no regular office hours had been fixed, though it was the usual custom to keep such office open from 8 a. m. to 6 p. m., authorized the submission to the jury of the question as to what were defendant's office hours.

**5.—Same—Charge of Court—Submission of Issue.**

Where the appellant company requested a charge exonerating it from liability if the message was received after its reasonable office hours, it can not object to the submission to the jury of the question whether such office hours were reasonable.

**6.—Assignment of Error—Brief.**

An assignment of error to the sufficiency of the evidence will not be considered where it relates to diverse issues which are grouped in the assignment, and no one of them is separately briefed.

Appeal from Cooke.   Tried below before Hon. B. E. Barrett.

*Wilkins, Vinson & Batsell* and *George H. Fearons,* for appellant.

*J. T. Adams,* for appellee.

STEPHENS, Associate Justice.—Action for damages resulting from delay in the transmission and delivery of a death message. The objections urged to the first, second, and third assignments of error, for not being briefed as required by the rules, under repeated rulings we must sustain.

The fourth, fifth, and ninth assignments raise in different forms the important question in the case, which is, in effect, whether or not the court should have instructed a verdict against appellee upon the ground that, to quote from one of the assignments, "the uncontradicted testimony showed that said message was transmitted to Chickasha and delivered to Jack Ware, and to plaintiff himself in time for plaintiff to have gone to Centralia and reached his brother before his burial, if the plaintiff had availed himself of the ordinary means of travel open to him," the case being one in which appellee was given a verdict for being deprived of attending his brother's funeral in consequence of the failure of appellant to promptly deliver to Jack Ware, at Chickasha, I. T., a message sent from Centralia, Mo., to Gainesville, Texas, and forwarded to Chickasha addressed to appellee in care of Jack Ware, announcing that appellee's brother was not expected to live. The message was received at Chickasha a little after 7 o'clock p. m., August 29, 1899, but was not delivered to Jack Ware until a little after 8 o'clock the next morning. Appellee, whose home was at Gainesville, but who had a ranch and was engaged in feeding cattle about ten miles from Chickasha, came to town

that morning and received the message about 11 o'clock. By taking a train which left Chickasha that afternoon at 2:30 he could have gone to Centralia, Mo., in time for the funeral of his brother.

We must therefore determine whether the excuse offered for not taking that train was such as to warrant the court in withdrawing the case from the jury, for it has been held in this State that such an issue is ordinarily one for the jury. Telegraph Co. v. Lydon, 82 Texas, 364; Telegraph Co. v. Terrell, 10 Texas Civ. App., 60; Elliott v. Telegraph Co., 7 Texas Civ. App., 482. It is, however, insisted that in this instance the excuse was so clearly insufficient as to bring it within the rule applied in Telegraph Company v. Birchfield, 14 Texas Civil Appeals, 664, and there is much force in the contention.

Appellee testified: "That on the morning of August 30, 1899, he went from his ranch to Chickasha and arrived there about 11 o'clock that morning; that Mr. Ware told him about the message, and he went to the depot and saw a copy of it; that the message was sent to Chickasha in care of Jack Ware, who was the plaintiff's groceryman; that the depot was 75 or 100 yards from the store of Ware; that when he, plaintiff, received the message, he sent a message to his nephew at Centralia that he would start on the first train; that he was in town that morning, and had come to get some medicine for his son who was sick, and was in his shirt sleeves and overalls, and that he went back to the ranch to deliver the medicine and to change his clothes, and give instructions about business; that his son was sick and nobody was in charge of the ranch; that he had hands working on the ranch; that he did not know that his brother was sick, but that he knew that his general health was bad; that after receiving the message he went back to the ranch and fixed up some matters hastily and returned to Chickasha and took the night train at 2 o'clock on the morning of August 31, 1899; that he went from Chickasha to Kansas City and from there to Centralia, arriving there about 10 o'clock p. m., August 31st. That when he got there his brother was dead; that he died at about 4 o'clock on the evening of August the 30th." He further testified on cross-examination: "That it was prairie country between his ranch and Chickasha, and that they had a pretty good country road all the way during August, 1899; that at the time he was worth as much as $10,000, and could have bought a suit of clothes; that he had money on hands to answer his needs, and had credit; that his sick son was 23 years of age and lived on his ranch; was married and keeping house, and was assisting plaintiff in managing his business at the ranch; that when he (the witness) was away, his son would take charge; that his son's wife was well, and that his son was not under the treatment of a doctor; that he had bilious fever, and had been to the doctor, and had been there for medicine; that his son had been sick for a couple of weeks, but was getting better, but was not up; that he had hands on his place; that he went back home after receiving the message to take some medicine to his son and change his clothes and give instructions as to his business; that he was able to buy a suit of

clothes, and that he could have hired some one to take the medicine out to his son; that he could have sent word out to his men by the messenger, giving them instructions about managing his affairs until he could return, but that it would have been a bunglesome way to do it; that after he received the message, he could have hired a team at a cost of about two dollars and driven out to his ranch and on the way thought of what instructions he wanted to leave; that he knew that a train left Chickasha on the evening of August 30, 1899, at 2:30 bound for Centralia; that after he received the message at 11 o'clock on the morning of August 30, 1899, he did not know whether his brother was dead or alive, and that he knew that it had been sent the evening before, and stated that his brother was not expected to live; that if he had gone on the 2:30 train on the evening of August 30, 1899, he would have arrived in Centralia about (12) noon the next day, August 31, 1899; that his brother was buried about 5 o'clock on the evening of August 31, 1899; that had the message been delivered to Mr. Ware by 8 o'clock of the 29th of August, he, plaintiff, could and would have arrived in Centralia the evening of the 30th, which would have been twenty-four hours earlier than he did arrive there, and about eighteen hours before his brother's funeral."

It was admitted that if the message had been promptly delivered he could not have reached his brother before his death. He further testified that no reply was received from the message: "Wire me this evening this place; I start to-night," which he sent to Centralia a little after 11 o'clock; that he waited nearly an hour for a reply before he started back to the ranch; that he had cattle feeding at three different places, and that his son was not able to give them attention; that he could not have given instructions as to their management in writing satisfactory to himself.

The issue was thus submitted in the charge: "Now, if you believe from the evidence that a reasonably diligent and prudent man, possessed of the same information that plaintiff had, and similarly situated and circumstanced as plaintiff was, as shown from all the evidence before you, would have started to his brother on the train that passed through Chickasha about 2:30 o'clock p. m. of that day, then the plaintiff will be precluded from a recovery."

Having set out the evidence constituting the basis of this charge, we need not discuss it further than to say that we can not quite assent to the proposition that it showed conclusively that the conduct of appellee in waiting for the night train was wholly inexcusable; there being a combination of circumstances apparently constraining such postponement of his journey, and a moral impossibility being equivalent to a physical one in cases of this kind, and what a person of ordinary prudence and diligence would have done under like circumstances being peculiarly a question for the jury. If the evidence *tended* to show a reasonable excuse for the failure to take the first train, and we think it did, it was the duty of the court to submit the issue to the jury. We are

not required by these assignments to consider the sufficiency of the evidence to sustain the finding that the excuse was reasonable, but only whether or not the issue was raised by the testimony.

The twelfth and thirteenth assignments complain of the court's refusal to charge the jury to find for appellant, if by a reasonable expenditure of money appellee could have lessened or prevented the injury, but we hardly think the principle thus invoked was applicable to the facts of this case. Something more than expenditure of money was involved in the excuse for the delay, and the requested charges, if given, would have taken this from the jury. The charge above quoted was all that was required.

The sixth and seventh assignments complain of the charges submitting the defense of office hours for delivering telegrams at Chickasha. It is first insisted that the evidence established beyond question the existence of such office hours from 8 a. m. to 6 p. m., and consequently that the court erred in submitting that as a controverted issue of fact to the jury. But we do not so interpret the record. The telegraph office at Chickasha was kept with the railroad office, and the call boys in the service of the railroad company, it seems, also delivered messages for the telegraph company; and while the evidence tended to prove that they were not required to do so after 6 o'clock, the operator testifying that the messenger boy employed by him went off duty at that hour, it also tended to prove that they often did so. The telegraph office was kept open till 12 o'clock at night, and it seems to have been the duty of operators at such offices as that kept at Chickasha to deliver messages themselves, and the company does not seem to have fixed any delivery hours for them, although there was evidence tending to show hours fixed by custom at such offices from 8 a. m. to 6 p. m., this being left, however, to the discretion of local operators, while at offices of a higher grade the hours were from 8 to 8. We doubt if it can be fairly said that appellant had any established hours for delivering messages at Chickasha, although the operator there testified that it had. At any rate the evidence warranted the submission of the issue to the jury.

It is next insisted that the court erred in submitting the reasonableness of the office hours for delivering messages to the jury. It is perhaps a sufficient answer to this contention to make the following quotation from appellant's third special charge, as an invitation to the court to submit the issue to the jury: "If you believe from the evidence that the defendant company had reasonable office hours during which it delivered telegraphic messages in the town of Chickasha, I. T., it was not by law compelled to deliver messages outside of said hours." .

But if this be not a sufficient answer, and it was the duty of the court, as appellant contends, to pass upon the reasonableness of the hours, we are yet not prepared to hold that the result should have been different. From 6 o'clock p. m. till night, according to railroad or even sun time, at Chickasha, I. T., was a long time in August, and must have covered a considerable portion of the business hours of that thrifty business

town of 2500 or 3000 people. The telegraph office was itself kept open for business till long after that time; the operator was there, and could easily have delivered the message, or had it done (as was his duty)—a message which in its very nature prompted diligence in the effort to deliver it, unless the operator was lost to all sense of the common obligations which humanity imposes. We can not escape the conclusion that a clear case of negligence was made out.

The last assignment of error complains of the verdict, but is not so made and briefed as to require us to pass upon the sufficiency of the evidence on any particular issue, since the complaints, which relate to diverse issues, are grouped in the assignment and no one is separately briefed, unless it be that of the excessiveness of the verdict, in which we find no merit.

. The judgment is therefore affirmed.

*Affirmed.*